May it please the court, Josh Ledford on behalf of Appellant Beth Bauer. We're here today because the district court committed... Let's be fair to your friend on the other side. I'm sorry. Let's let him get going and have a pen and paper out in case you say something he wants to respond to, although it's really clever. If you get your argument, he won't even be able to respond, but I don't think you... I apologize. You didn't see what was going on, so why don't you start all over again? Great. Thank you. We're here today because the district court committed reversible error by failing to properly apply fundamental points of law, and I'm going to begin with the constitutional issue. And in my perspective, the district court sidestepped the general rule of the Constitution prohibits patronage dismissal. And what I mean by that is this. The district court didn't step back and analyze the fundamentals of this constitutional area of the law, and that is, where's the genesis from patronage dismissal? And if you review the case law, the patronage dismissal comes from the concept that there are some employees in the public sector that hold positions that can impair a public actor's political agenda. And that goes back to the McLeod decision with the four categories, and that's an extension of that idea. And category two, our policy. I don't understand how you can start out by saying that the district court disregarded that. I mean, though, from page five on to however many it is, that's exactly what the district judge is talking about in this decision. It goes by, it goes through McLeod, the factors. I understand you may disagree, but there's certainly an extensive consideration of the constitutional question here. What I mean by that, your honor, is that the district court did not step back and actually analyze the genesis and the reason for the exception. That's what I mean. And if I can go further and kind of tie that in. What I mean by that is, under McLeod category two, that position that stands in a situation where they've been delegated a substantial amount of political policymaking authority, that type of position can be subject to political patronage dismissal. What the district court did is misconstrued this area of the law and held essentially that policymaking as a general sense is sufficient to allow for patronage dismissal. And that's just not the case. Under Justice v. Pike County, it's clear what distinguishes a category two employee from other managerial, other supervisor employees, is the exercise of discretion of political significance. Let me just ask you this intuitive question. I just would have thought going into this, without looking at your briefs, that if you have an elected county prosecutor or an elected attorney general, those are pretty significant positions, a lot of confidential stuff that goes through them, that whether the person was, quote, merely a secretary, but secretaries are kind of the traffic cop for what gets to the prosecutor or the AG, or if the person was the office legal manager, either one, of course I would have said the AG or the prosecutor gets to bring in their own person. They have access to all the critical information in the office, and how could you not say you get to bring in someone you trust for that position? It just seems really odd to me that a political opponent's secretary or office legal manager could be that traffic cop. I can't imagine it. The record reflects that the office manager is not the equivalent of a confidential secretary to the prosecutor. That's why I said either. I said I don't care which way you look at this. As a secretary or a legal office legal manager, either one, I would have said, boy, of course you get to have your own, and you can't have the prior person, potentially from the opposite political party, foisted upon you for your four, eight year tenure as prosecutor or AG. That would just stun me. This position, I think you're referring to really the category three, controlling the lines of communication with the prosecuting attorney, and that line of case law reflects that a position that channels public communication with the office holder or the office holder's communications with the public's electorate, that position is subject to political patronage dismissal. The legal office manager does not control those communications. Many other employees control those communications, and moreover, the chief assistant prosecuting attorney has communications with the commission as the outside, as representative of the prosecutor's office. It is not the legal office manager. So what you have to do is stand back and look at the actual job duties of the legal office manager, and they simply do not rise to that level. The legal office manager- Let me ask you the question this way. We have a lot of cases that have dealt with various positions, particularly under this category two, and the cases that hold that the position does fall within category two include chief deputy county clerk, business manager, administrative officer, purchasing agent, chief financial officer, office manager. All those sound like they're fairly close to what this position was. They are completely in opposite. Every single one of those- Not just in opposite, not completely in opposite. Yes. And for the fundamental reason that all of those positions hold the category one power of the delegating official. For instance, the judicial, the law clerk line of cases, you're holding judicial power. The CFO cases that are referenced by defense- Law clerks are holding judicial power? I'm sorry, judicial- A couple people agree with you. The referee case, I think it was the Mumford decision. They're actually- Let me just make it clear that what I was citing you to are all category two positions. They're not category one. Right. You become a category two position because you're delegated the category one officials, category one power. And a prosecuting attorney, their category one power is criminal prosecution. As a matter of Michigan law, that power has been delegated to the chief assistant prosecutor and the other prosecuting attorneys. The legal office manager, it is unequivocal of the record, holds no prosecutorial power whatsoever. Going further, the legal office manager doesn't supervise the prosecuting attorneys. She supervises clerical staff. That's it. And even then, the legal office manager does not supervise the clerical staff's daily work activities. Prosecuting attorneys assign out work to those other clerical staff. The legal office manager's main role is there to ensure people are on time, they're following the rules, they're doing what they should be doing, that there's equipment there for them to do the job. Hiring and firing authority. Hiring and firing authority, again, that is circumscribed. The legal office manager. There is such power though. Not full hiring and firing authority, no. How about administering the budget? I'll respond to Judge Sutton and then the budget I'll take next. Hiring and firing, she has no power whatsoever over the prosecuting attorneys. Going further, the hiring authority over the clerical staff, you can't take politics into that consideration. Those are non-policy making employees. You're simply acting as a supervisor in that capacity. Clerical staff includes secretaries? I believe so. The record doesn't reflect that there is a quote unquote confidential secretary to the prosecuting attorney in this situation. I'm going to bet the odds are high there is. I've never heard of an office where there isn't. And that position may be subject to significant the person who has authority over that confidential secretary. Because that person is not impacting the prosecutor's political agenda. That person is acting as a supervisor, making any decisions that a supervisor would. The legal office manager. Why are they mutually exclusive? I'm completely missing that argument. Because the legal office manager's political agenda cannot be used to influence and impair the prosecuting attorney's political agenda. The legal office manager, and I'd cite the Evanson decision in Murphy v. Cockrell. All the legal office manager does is apply policy that's set in place by the county and the prosecuting attorney through collective bargaining. If you step back and really look at the legal office manager, what is critical here is a legal office manager is actually less of an agent of the prosecutor than of the county. All the policies that she's enforcing are county policies. The prosecuting attorney's office is similar to a department in an overall company, an overall organization. The legal office manager works with county HR in handling HR related duties. County HR handles the HR related duties where there's some room for discretion, room for judge making. But going back to the hiring aspect, she only has a small subset of that. She interviews some initial candidates for clerical positions. That's what the record reflects. But also the chief assistant prosecutor is there interviewing employees as well. There is some thinning of the herd that goes on, but the ultimate decision is made by the prosecuting attorney. There's at least a question of fact to the amount of discretion and power that the legal office manager actually has in the hiring role that prevents summary judgment on that point. With budget, I think the budget is even more clear. With qualified immunity, if you're right on the First Amendment point, would qualified immunity apply to the defense? McCloud prevents that. A glorified supervisor does not fall within the patronage dismissal exceptions. You're just saying Judge Guy, I'd like to hark back a little to Judge Sutton's first question to you. And that is, given this situation where a new person is elected, can you conceive of no set of circumstances, putting aside for a moment your contract argument, but can you conceive of no set of circumstances where that person couldn't be replaced? Some of the patronage cases we have are sheriff is elected and he fires all the deputies because he wants to bring in his own people. The whole concept of patronage is really doing something for somebody, not something against somebody. And I pose to you, supposing that the prosecutor comes in, had the same loyal secretary for 15 years, who knows his work habits and everything inside and out. But I have trouble characterizing replacing the person there with this person as a violation of the First Amendment. Thank you. It is for the reason that this position does not fit within the categories at hand. This position has not been granted broad discretionary policy-making authority of political nature. This position is a supervisor and that is it. If this position were truly recrafted such that it were a confident and closely related to the prosecutor like that, and done so in good faith and not pretextually, then that may apply. But the case at hand, we've presented sufficient facts to show that the legal office manager simply does not have broad discretionary authority. Aren't you, I know we're shifting gears here from category two to category three, but aren't you just simply reading out the language or other confidential employees who control the lines of communication to category one positions, category two positions, or confidential advisors? Isn't that Judge Guy's question right there? I didn't take it like that, but I'm not saying that. What I'm saying is they are two separate things. And the legal office manager certainly does not make political policy. What I'm saying is if the legal office... Any question about this right-hand office manager person being the one that controls the lines of communication? Absolutely, because the lines of communication are controlled by many other individuals and also the chief assistant prosecuting attorney. Because one of the key... I kind of thought that prosecuting attorneys were out prosecuting and this person is back minding the store during the day. Both the prosecuting attorney and the chief assistant prosecuting attorney spend the majority of their time in the office. They are not prosecuting cases. That's in the deposition transcript. They are managing the overall office operation. You're suggesting that they act as the gatekeepers to the prosecutor? It doesn't even make sense. There is no gatekeeper here. You have situations where the county's contacting the prosecutor directly. The public's contacting the prosecutor directly. This is not a situation where... Just sitting in the corner like a potted palm during this period? He's not the person that somebody has to come to to secure audience with a prosecuting attorney. That's not the way this situation works. If she were, she would control the lines of communication. She does not. I want to quickly address the budget issue. 90% of the budget is set by the county. Salaries, wages, friends or benefits, all set by the county. The county determines the number of classifications that will be filled in the prosecutor's office. That's over 90% of the overall financial aspect of the operations. The remainder of the budgetary concerns, all the legal office manager does is look at historic usage and multiply a number by a price and arrives at a figure for an estimated budget. Let me ask another question because your red light is just flipped on. Both of you, there was a grievance filed in this case, right? That's correct. Both of you agreed to hold the grievance in abeyance during the pendency of this case? The union did. I wasn't involved in that. I don't know that I meant you personally. I'm sorry. You were there representing somebody, right? The union did agree to hold the grievance in abeyance. Okay. Now, I want you to assume, for purposes of my question, that the CBA does apply to this person. Okay. If that's true, how have you satisfied your exhaustion requirements? The grievance procedure only applies to grievances that arise under the contract. In this matter, I asked you to assume that the CBA applies to this position and to this employee. I am, your honor. You're saying that even then she doesn't have to file the grievance? She doesn't have to follow the grievance procedures under the collective bargaining agreement? This type of dispute doesn't involve a breach of contract and would not come into play under the grievance procedure scope. But I thought the point was that she thinks she can only be fired for cause. For cause is the contractual aspect of this case. That's different than the First Amendment violation. And I thought you were referring to the First Amendment violation itself. Well, I wasn't really distinguishing one from the other, so it would be fair for you to do so in your answer. I look at those as two distinguishable rights. But how does this work then? If you lose the First Amendment case for the sake of argument, don't you still want to argue alternatively that your client can only be fired for cause? Absolutely. And doesn't that have to be exhausted? If the contractual right, the MOU, if that were part of the CBA, it would happen. I'm asking you to assume that the CBA applies and incorporates the MOU or vice versa. I think the answer is yes. Then you have to exhaust, right? Yes. All right. That's all I want to know. Okay, great. You'll get your full rebuttal. Thank you. Thanks so much. Mr. Curlew? Good morning. Douglas Curlew on behalf of the defendants' appellees. It really sounds like, notwithstanding all the ink that's been spilled here, that we really don't have a contract claim before us. You both agree it's got to be exhausted, right? Certainly you argue that. Well, I would agree that if there could in fact have been a contract initially that would have covered this, if in fact the MOU is part of the contract, if it exists at all, if it can bind McColgan as the successor, and we argue that it can't. But if we were to assume, then certainly there needs to be exhaustion if it is a valid contract and applicable to McColgan. The answer is yes. We're only talking here then about the First Amendment claim? No, I had no intention of relenting on the contract claim. I think we briefed it very strongly. I know you did, and I'm trying to figure out how we even get to it if you have to exhaust. Well, you only have to exhaust if in fact the MOU and the contract was valid and binding as to this action by McColgan. If McColgan, as he says, I'm not party to it, I'm not part of it. Now you're taking her position on this? No, McColgan says I'm not party to that. There's no contract binding me to you. This MOU doesn't apply to me. And under Michigan law, you can't constrict by contract with my predecessor, my statutory authority to change staff. Public collective bargaining agreements, the government side of it, the public side of it, can get out of it because there's a new official. I mean, that seems really strange to me. So under your theory, let's just say it's not an election, but you have a CBA. It's a three, four-year CBA with or without an MOU, who cares? And the prosecutor dies in office and you get a new prosecutor. That new prosecutor can say what you're saying? All these employees do not get the benefits of the CBA? Well, that's our position with regard to this particular office because of the way the office is defined. I mean, this isn't a secretary. This isn't the janitor. So what happens if there's a death in office, you have a new governor, whomever appoints this new prosecutor, and day one they have to negotiate a new CBA and no one's protected? With regard to the legal office manager position and people of that stature, yes. I did want to make a point. As the appellee having to accept the reply without being able to do a written reply, there's an argument made in there, the Public Employment Relations Act argument, and that may be some of what you're touching on. That was argued in the plaintiff's motion, their own motion for partial summary disposition in the district court. We responded. Our response is Record Document 47. When they filed their principal brief on appeal, that argument was missing and I assume that they had abandoned that. However, it resurrected itself in the reply. I think as this panel knows, you can't make an initial argument in a reply brief that you didn't do in your principal brief. So how far does the CBA, that you don't think binds your client, go into your client's tenure? Is it for a year? Pardon me? I'm sorry. How long? You're saying the CBA does not bind your client, okay? Right? That's your point. Correct. The length of the CBA, the length of the CBA, how far into your client's tenure does it go? A year? No, I think I may have confused myself and confused the court. I'm not arguing that the CBA exists and applies. What we've argued is that this MOU, this additional document by which Beth Bauer claims, I'm not at will like everybody under the CBA. I'm something special. I'm a just cause employee. That's what we're arguing does not apply. If a CBA can bind people, why can't an addendum to a CBA bind people? That's all an MOU is. Well, this particular MOU treads upon the statutory authority of the prosecutor with regard to people in Beth Bauer's case. You've just acknowledged that a CBA can tread upon that authority, right? You've just acknowledged that? Let's assume that the CBA does apply. If that's the case, then we've got the exhaustion argument, which has not done, and that's what Judge Ludington found. I think Judge McKee was correct. If you're right that the MOU doesn't apply, the CBA still applies. You're not contesting that argument. We've not contested the CBA. This position is covered by the CBA. Correct, which would make it at will. That's ignoring Bauer's argument. Bauer's argument is there's a special rule that says instead of at will, she's still treated as for cause. Well, she argues that, but I would argue that even if we accept the MOU as being part of the agreement, it doesn't say that she can't be discharged. What the MOU says is we are to apply discipline to her. That would be just cause in the disciplinary scheme. It doesn't say that we're foreclosing your ability to simply discharge her in the context of your statutory authority to do so. That's not what it says. In Michigan, a contract is interpreted by its specific terms as written very strictly. I thought the MOU made clear she could only be discharged for cause. The word discharge does not appear there. It's discipline for cause. We can fine you, so you can do the smaller but not the greater? Well, because it wasn't a disciplinary thing. It didn't say we're getting rid of you because you've done something wrong. I'm discharging you because I want my own office managed. Our discipline is going to be we're going to fine you for each day you show up on the job after we fire you. Well, they didn't do that either. They just said we have discharged you. That's okay. But that's the position. As Judge McKeague pointed out, Judge Ludington's decision was very, very detailed on this. And I think there's one case particularly noteworthy, given some of the discussion that was had on the political dismissal, is Judge Ludington cites Sewards versus Loudoun County. And that explains that we don't want to get overly caught up in the categories per se. Bower's argument is we've got these categories. They're very rigid. The Sewards versus Loudoun County says they're guides. The position doesn't have to be shoehorned into one of those to fall within the parameters. But I think two and three apply, because two talks about delegated discretionary authority. Well, whatever Bower may have done, Lopez has over budgetary items in the office. Category three applies, because that deals with people who deal with confidential communications, confidences of the elected officeholder, and certainly the description that we have from Lopez, whatever Bower used to do. What we have from Lopez is that's what I'm doing. I interview the people that come to this office. And then I talk it over. You're talking First Amendment now, aren't you? I'm talking the First Amendment. I've jumped. Forgive me, but I'm still struggling with what's going on on the contract claim, and I'd be really grateful if you ... I think this is what Judge McKeague was trying to clarify. And tell me if this helps clarify for you, Judge McKeague, or maybe me. Is another way to think about exhaustion, and you've got to go through the grievance process first, is all of your arguments about what MOUs can do, what they can't do, we'll call those legal issues. But it's not unusual in the grievance process to have those issues resolved along with any factual issues. And you still get federal court review later on. So why isn't another way of putting Judge McKeague's question to both of you, listen, we don't know how this works, but that's part of what the grievance process is about. We'll get some information from some experts. You'll get a decision that says, here's what this means. And given this interpretation about what the law is, here's factually what happened, and you can or can't be discharged. And once that's done, if someone's dissatisfied, they can go to federal court, but we'll then have the benefit of that input. Well, that would be true. And the bottom line... So is that... Just give me a really quick answer. Is that okay with you? Does that make some sense? Well, it does make sense. We would rather not have to deal with that, obviously, which is why we make the argument we do. But the bottom line... If she wins her contract argument, then you never get to the First Amendment argument. That would be true. And the bottom line... It's almost, in a perverse way, and thought about it until just now, it's almost like a Pullman question. Yes, but the bottom line being, though, that for purposes here today, the worst we get is sent back to exhaust the remedies under the contract. This case doesn't survive. It gets sent back, as Judge Luddington said it should be, to the exhaustion of the remedies, and the case ends. Why does the... Well... Judge Luddington dismissed the case. He said, without prejudice... If Bauer's not satisfied after the grievance process, Bauer can challenge what happened in federal court, right? Well, that would be true, yes, but that's not this case. That would be a subsequent case. Judge Luddington has dismissed this case without prejudice. I just have this overriding sense that we're really missing something here. I don't mean to suggest that what happened to Beth Bauer is not important to her and maybe to the whole county of Saginaw. I'm not suggesting that for a second. But you've got the CBA, the MOU, it only deals with one person. You've got somebody that, at least superficially, seems like it would be a confidential person vis a vis the prosecutor. You've got the prosecutor, you've got the statute. Why are you guys in the Court of Appeals? There's something else going on here, I'm positive. Is this a part of some broader dispute between the union in general and Saginaw County? Is this a part of a whole bunch of cases or is this really a one-off? This is a one-off as far as I know from the record that I'm privy to. This is simply an individual who had, as she described it, I don't even know where the MOU came from. I don't know how it came about. I was told about it after the fact and she never really saw any need to enforce it until after McColgan got there and she was dismissed. And then she goes from what had been her previous testimony that we highlighted in I thought I was always there at the will of the prosecutor. It wasn't until after the discharge that she said, well, maybe I wasn't at the will of the prosecutor. What's this MOU thing about that I knew nothing about? And then it becomes an issue, we don't even know where it came from. I mean, we could speculate but that's not our purpose and I certainly don't want to speculate as to where that came from or how that was created. We just don't know. All we have is the document itself and which has to be interpreted by its own terms and I understand Judge Sutton's position but it does just talk of discharge, I mean talk of discipline not discharge and this was not a disciplinary situation. But you agree the exhaustion process can clarify that interpretation. What discipline means, what the MOU means, what Michigan law says about MOUs and CBAs and future prosecutors, that all can be, everybody gets to make their arguments there, right? In theory, certainly. I mean, that's what would happen if it went back on those grounds. So back to the obvious, why are you all here? You knew about that. You all agreed to simply hold the grievance in abeyance until this lawsuit was finished. Why would this be the right form at this time? That's what I, at least I'm still missing. Well, because Judge Ludington made his ruling and Beth Bauer appealed it. That's what gets me here. Well, I mean, maybe Judge McKee's saying, thinking like constitutional avoidance and I guess, I mean it is true if we did the grievance process, it's possible Bauer wins and there's no need to do a First Amendment claim but I guess the thing that might be tricky on that is that there's, you don't have to exhaust First Amendment claims. There's no rule about exhaustion First Amendment claims. You're allowed to bring them whenever. And of course the bulks of the briefs were on First Amendment issue and that's been, I suppose, the most hotly contested. That doesn't mean we want to do it. But the other thing, Judge Guy here, the other thing is, of course, you're not abandoning your argument that the mutual understanding agreement is not part of the collective bargaining agreement because if it isn't, that pumps life into your argument about the prosecutor's statutory powers and sheds doubt on whether an agreement just between parties can bind a successor. Our position is that it is integrated into the agreement that one has to read the documents which both reference one another with the MOU being particularly contingent upon the creation of the CBA and of no effect until there is a CBA. It's certainly part and parcel of that agreement. I understand that, but of course your opponent argues that it isn't incorporated. And I don't see how he can argue that given the language of the document itself. As your honor knows, Michigan contract law in particular is very sticklerish about the... Right. I agree with that, but by him arguing that, in effect, resurrects your other argument. I'm sorry? I say by him arguing that, it actually then takes you to the argument that if it isn't part of the collective bargaining agreement, then other forces come into play. Whether you contend it is or not, I'm just talking about what he contends. That would be correct. But again, like I say, I don't think it applies to the particular circumstance we have here by its terms. If the panel has no further questions. No. Thanks for helping us try to sort this out. And I would just like to say I'm a little disappointed that Judge Guy wasn't able to be here personally. My first experience as a law student going to observe a courtroom was a motion call conducted by Judge Guy, where unexpectedly to me, not knowing much about anything, one of the most eccentric and irascible members of the Michigan Bar appeared before him, and I left that courtroom very confused as to what goes on in courtrooms. I thought you meant that was Judge Guy. No, no, certainly not. Thank you. I thought there was a compliment there somewhere, but it never emerged. No, I think there was. I will add another one. One thing, Judge Guy, that you could not see is when he responded to you, when he was responding to questions by me and Judge McKee, he looked straight at us. When he was responding to you, he looked to the ceiling as if the question was there. Okay. So we have rebuttal. Go ahead. Thank you. Judge McKee, I think what you're asking, what's missing here? There is something missing here, and that is the MOU was meant to guarantee Beth Bauer just cause protection, not at will status for the remainder of her employment. If the MOU was simply a manifestation of the CBA, it's limited by a term. That is why the MOU was crafted as an independent contract, to protect Beth Bauer fully and to give her the independent right to sue on that document. Just so we know what it's worth talking about, don't you agree that the grievance procedure can identify both legally what's going on? No, no, no, because the MOU is not part of the contract. I did not agree that the MOU is part of the CBA. You were making an assumption in my earlier line of questioning. The MOU is independent. It is a standalone contract. I just want to make sure you're answering the question I'm asking. The question I'm asking is not, I'm not disagreeing with you about that. I'm just saying in the grievance process, don't both sides get to fight that point out in the grievance process? The district court already ruled that the grievance process only covers the CBA. So you only get to that question if the MOU is part of the CBA. Well, why don't we just clarify that the grievance process, this legal debate can be held there? It cannot because this is a question of arbitrability, not of procedural arbitrability that is properly answered by the court. The MOU, of course, says the MOU shall have no force or effect unless and until a new CBA is ratified. So to say, may I finish? Yes, absolutely. I apologize. So to say that this is to simply, at least in my reading of this, ignore the wording in both the MOU and the CBA. Under Michigan law, as soon as that CBA was executed, Beth Bauer became a vested third-party beneficiary. She had the right to enforce the four corners of that document as they existed at that time. The CBA coming into play is only a conditioned precedent. And moreover, under Michigan law, you don't incorporate wholesale documents. In my brief, I cite a that says you only incorporate to the extent referenced. And the MOU itself only references the new CBA having an appendix stating at will employee. It does not reference CMOU. Your argument seems to be then, if I understand it right, that her entire employment contract, so to speak, all the rights and duties and obligations arising thereof, all are wholly what is contained in the MOU and what is created by the MOU is the right to just cause employment, the right to be free from at will discharge. I got that. That independent right. That is my argument. And that is separate and distinct from the CBA because the CBA actually disclaims just cause employment for that position. The MOU grants that. I'm not frankly even sure what question or argument you're responding to here because the question we've been asking you is, does, do the other provisions of the CBA also, at least not inconsistent with this, also control her employment relationship? Seems to me the obvious answer to that is yes. And doesn't that include the duty to exhaust? Not for this independent... Your basic point is the MOU is a separate contract. Yes, it may have grown out of the CBA, but it can't be bound up in the CBA grievance process or any other CBA requirements. That's your basic point. Just say yes or no. Yes. That's what I thought. That's all I want to know. And I think I also know the answer to that, but I just want to make sure I understand what you're saying. It's a separate freestanding contract. Yes. Okay. That's great. All right. Thanks to both of you for your briefs and for your oral arguments. We appreciate them both. The case will be submitted and the clerk may call the next case. We will need to get Ms. Davis on the line. Okay.